## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANTHONY DAVID BROOKS CLARK, ) | |
| as Administrator of the Estate of ) | Case No. 07 CV 4895 |
| TAMARA BOWENS, ) | |
| ) | Judge John W. Darrah |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| OLD MUTUAL FINANCIAL NETWORK ) | |
| and FIDELITY AND GUARANTY LIFE, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Anthony David Brooks Clark (Clark), as administrator of the estate of

Tamara Bowens, filed a one-count complaint in this case against Defendant Old Mutual

Financial Life Insurance Company ("OM"), formerly known as Fidelity and Guaranty

Life Insurance Company, alleging breach of contract in connection with a life insurance

policy issued by OM to Tamara Bowens, deceased. Clark seeks death benefits under the

policy and attorneys' fees and costs for OM's refusal to provide coverage. Trial of the

case was by the Court without a jury.

The Court has considered the evidence, including the testimony of witnesses and

exhibits, and has further considered the written arguments and proposed findings of fact

and conclusions of law submitted by counsel for the parties. The Court has also taken

into account: (1) the witnesses' intelligence; (2) the witnesses' memory; (3) the witnesses' ability and opportunity to observe; (4) the witnesses' manner while testifying; (5) any interest, bias, or prejudice of the witnesses; and (6) the reasonableness of the witnesses' testimony when considered in light of all the evidence in the case.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence as well as the Court's determination of the credibility of the witnesses. To the extent that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

At all times relevant hereto, Clark resided in Illinois. OM is a corporation incorporated in, and having its principal place of business in, Baltimore, Maryland, and, at all times relevant hereto, was authorized to do business in Illinois. Tamara Bowens is Clark's sister, and he is the administrator of her estate.

In March 2004, Tamara Bowens and her husband, Ronald Bowens, applied for life insurance called "Savers Select" through OM. On March 27, 2004, Lucita Zamoras, an agent of OM, met with Mr. and Mrs. Bowens at their residence after they responded to a mass mailing sent out by Zamoras regarding "mortgage protection" insurance. At the March 27, 2004 meeting, Zamoras gave the Bowenses a sales presentation, explaining various offered insurance programs. Mr. and Mrs. Bowens applied for OM's "Savers

2

Select" life insurance in the amount of $300,000.00. Ronald Bowens applied as the "primary insured," and Tamara Bowens applied as the "other insured."

OM's application consisted of two parts, Part 1 and Part 2. Zamoras filled out Part 1 of the life insurance application with Mr. and Mrs. Bowens during the March 27, 2004 meeting. In addition to other information, Part 1 of the application asked a series of questions regarding the medical history of the "primary" (Ronald) and "other" (Tamara) insured.

Zamoras asked Mr. and Mrs. Bowens individually the series of questions pertaining to medical history listed on Part 1 of the application and checked the box that corresponded with their answers to each question, either yes or no. One of the questions asked was whether the applicant had ever been treated for or diagnosed with "[a]ny heart disease, heart attack, chest pain, high blood pressure, high cholesterol, murmur, palpitations, or any other disorder of the heart or blood vessels." Tamara Bowens responded "yes" to this question, and Zamoras checked that answer on the form, underlining the words high blood pressure. Zamoras also indicated that Tamara responded "yes" to the question of whether Tamara was "currently prescribed any medication." Zamoras also wrote handwritten notes on the form, recording Tamara's explanation of her "yes" responses. Specifically, Zamoras recorded that Tamara had been diagnosed with high blood pressure that was "controlled" by medication, Lotensin and Atenolol.

Zamoras indicated that Tamara answered "no" to the following questions on the Part 1 form: whether she had "been hospitalized or had surgery" or "[h]ad any

3

electrocardiograms, x-rays, laboratory tests, treatments, or procedures" within the preceding ten years.

Tamara Bowens also disclosed to Zamoras the name and contact information of her personal physician, Dr. McCulley; Zamoras recorded Dr. McCulley's information on the form. Ronald and Tamara Bowens each signed Part 1 of the application, representing that the statements they made in the application were "complete; true; and correctly recorded" and authorizing their physicians to give OM information pertinent to their application.

About a month after this meeting, on or about April 24, 2004, Te'shica Caldwell, a paramedical examiner, met with Mr. and Mrs. Bowens at their residence. Caldwell, who was not a medical doctor, asked Mr. and Mrs. Bowens questions, appearing on Part 2 of the application, recorded their answers and obtained blood and urine samples from them. Caldwell completed a Part 2 form for both Ronald and Tamara Bowens. Caldwell was not provided a copy of the Part 1 forms previously signed by Ronald and Tamara Bowens.

Question 1(a) of Part 2 asks: "Within the past 10 years, have you had any known indication or been treated for: Any disorder or disease of the: Blood or circulatory system, such as: chest pain; palpitation; high blood pressure; high cholesterol; rheumatic fever; heart murmur; heart attack; anemia?" Caldwell recorded that Tamara Bowens responded "yes" to this question and underlined high blood pressure. Caldwell also recorded that Tamara responded "yes" to the question of whether, within the preceding five years, she had a "checkup, consultation, illness, injury or surgery" and underlined

4

checkup. The Part 2 form asked the applicant to "give details" of any "yes" answers.
With respect to Tamara's report of high blood pressure, Caldwell recorded that Tamara
reported she was diagnosed in 2003 and provided the name of her doctor, Dr. McCulley.
She indicated that she had had a checkup in 2004 with normal results.

Caldwell, however, recorded that Tamara responded "no" to both of the following
questions on the Part 2 form:

2. Other than mentioned in number 1, within the past 5 years, have you:

(a) Been in a hospital, clinic, sanatorium, or other medical facility for
operation, observation or treatment, or been advised to and not done so?

(b) Had electrocardiogram, X-ray or other diagnostic tests, or been
advised to and not done so?

Below the medical history questions, Part 2 of the application provides a space for
the signature of the proposed insured and states: "I have read the questions and answers
on Part 2 of this application. To the best of my knowledge and belief, the statements
made in this application are: complete, true and correctly recorded." Caldwell did not
obtain the signature of Tamara Bowens in this space.[1]

Caldwell also completed the second page of Part 2, entitled "Medical Examiner's
Report." Caldwell measured Tamara Bowens's height and weight, took her blood
pressure and pulse, and conducted some preliminary testing and obtained a urine sample
from her. Tamara Bowens's blood pressure and pulse rate were within normal range.

Caldwell submitted the Part 2 forms she completed for Mr. and Mrs. Bowens to
her supervisor. These unsigned Part 2 forms were never subsequently returned to

---

[1]Likewise, Caldwell did not obtain a signature from Ronald Bowens on this page of his
Part 2 form.

5

Caldwell in order to obtain signatures, and signatures were never obtained.

At trial, Zamoras and Caldwell testified as to the facts stated above regarding Tamara's responses to Parts 1 and 2 of the application. The testimony of Zamoras and Caldwell established that the responses attributed to Mrs. Bowens to the questions on Parts 1 and 2, as stated above, were made by Mrs. Bowens.

On April 28, 2004, four days after Caldwell met with Mr. and Mrs. Bowens, OM issued a Certificate of Group Level Term Life Insurance to Ronald Bowens. OM issued to Tamara Bowens a Dependent's Level Term Life Insurance Rider to Ronald Bowens's certificate, in the amount of $300,000.00, at a standard rating. Despite having the label "Group Level Term Life Insurance," the Certificate and Rider issued were individually underwritten and handled like individual policies by OM. Tamara Bowens's life insurance rider stated: "We will not contest this policy based on statements made in an application after the policy has been in effect during the insured's lifetime for two years from the Date of Issue."

On March 28, 2006, within the two-year contestability period stated in the Rider, Ronald and Tamara Bowens and their teenage daughter were murdered in their home. A post-mortem examination of Tamara Bowens was conducted by the Cook County Medical Examiner. The report of the Medical Examiner found that Tamara Bowens died from multiple gunshot wounds. The examiner's report states that Bowens's cardiovascular system was free of atherosclerotic disease.

In June 2006, Clark, as administrator of his sister's estate, submitted a claim for death benefits under Tamara Bowens's term life insurance Rider. Thereafter, OM

6

conducted an underwriting contestability review of Clark's claim. In connection with this review, OM obtained, and reviewed for the first time, Tamara Bowens's medical records. The records were admitted into evidence at trial. In addition, OM obtained and reviewed the Postmortem Examination Report for Tamara Bowens, which was also admitted into evidence.

Tamara Bowens's medical records showed the following facts: she (1) had had electrocardiogram tests (EKGs) and an abnormal EKG; (2) had reported chest pains to her doctor in 2001, 2002, 2003 and 2004; (3) had been diagnosed with coronary artery disease; and (4) was hospitalized for three days in October 2003 after complaining of chest pains.

OM's Vice President of Claims and Compliance, Russell Law, made the final decision to decline coverage on Mrs. Bowens's Rider based upon the determination of OM's Vice President and Chief Underwriter, Dennis Gunderson, that OM would not have issued the Rider to Mrs. Bowens as applied had OM known the information disclosed in Mrs. Bowens's medical records. On November 15, 2006, OM sent Clark a letter, denying coverage and rescinding Tamara Bowens's life insurance Rider under Section 154 of the Illinois Insurance Code on the basis that Tamara Bowens made material misrepresentations about her medical history in her application.[2]

Dennis Gunderson testified at trial for OM. Gunderson holds a bachelor's degree in economics, a master's degree in business administration and has thirty-one years of experience in underwriting. He is a fellow in the Life Management Institute and the

_____

[2]OM paid on Ronald Bowens's policy.

7

Academy of Life Underwriting. Gunderson testified that he received a contestability referral on Tamara Bowens's Rider from OM's claims department. He was asked to determine whether OM would have issued the Rider to Tamara Bowens as applied for had OM known of the facts revealed in Tamara Bowens's medical records. In making his determination, Gunderson considered the underwriting file, a summary of information contained in Tamara Bowens's medical records prepared by the claims department, and Tamara Bowens's medical records.

Gunderson testified that the facts revealed in Bowens's medical records as to her abnormal EKG tests, chest pains, hospitalization for chest pains and diagnosis of coronary artery disease all had "underwriting significance." He testified that had OM known Bowens's medical history as reflected in her medical records, based on OM's applicable underwriting guidelines, OM would not have issued the policy to Bowens. Gunderson acknowledged that a signature on Part 2 of Mrs. Bowens's application was not obtained. Gunderson testified that, in making his determination, he considered only Part 1 of Tamara Bowens's application, the lab results, the paramedic body fluids, or the pulse, blood pressure readings and the medical records that existed prior to the date of the policy's being approved. He testified that denial of the policy was justified on the basis of Tamara Bowens's representations in Part 1 alone.[3] Furthermore, Gunderson testified

_____

[3]Plaintiff argues that "OM had a conclusive and undisputed autopsy report" of Mrs. Bowens in its file (*i.e.*, the post-mortem report of the coroner), showing that Mrs. Bowens did not have coronary artery disease. However, as Plaintiff concedes, whether a misrepresentation occurred is an objective consideration based on the facts known to the insured at the time of the application. *Ratcliffe v. International Surplus Lines Ins. Co.*, 550 N.E.2d 1052, 1057-58 (Ill. App. 1990). As Gunderson testified, the post-mortem report did not exist at the time of Mrs. Bowens's application or OM's approval of the policy. Furthermore, Gunderson also testified that even if Mrs. Bowens had been incorrectly diagnosed with coronary artery disease, OM still

8

that the policy issued to Mrs. Bowens, and Parts 1 and 2 of the application, were all approved by the Illinois Department of Insurance.

Plaintiff Clark offered the testimony of Frederic Mendlesohn, who was accepted as an expert in the insurance field based on forty years' experience while employed in various capacities in the insurance industry. Mendlesohn testified that in his opinion, the questions asked on Part 1 and Part 2 of Mrs. Bowens's insurance application were phrased in ways that were too broad and all-encompassing, such that a reasonable person would not understand clearly what was being asked of them. Mendlesohn further opined that OM's conduct in its handling of Tamara Bowens's application failed to meet the standard of care in the insurance industry in several ways: first, OM breached the standard of care in failing to contact Tamara Bowens's physician, identified in her application, to find out what exactly Mrs. Bowens's condition was before issuing life insurance to her. It was Mendlesohn's opinion that if the applicant provides the name of her doctor, it is prudent practice for an insurance company to follow up with the doctor regarding the applicant's health and that Tamara Bowens sufficiently answered the questions put to her by disclosing that she had high blood pressure and the name of her physician and authorizing OM to contact him. In addition, Mendlesohn testified that OM was negligent in failing to obtain Mrs. Bowens's signature on Part 2 of her application, verifying that the disclosures she made on the form were accurate and correct. In Mendlesohn's opinion, the proper course under the circumstances here would have been for OM to pay Clark's claim. Regarding OM's claimed defense, Mendlesohn testified,

---

would not have issued Mrs. Bowens the Rider, based on other omissions of Mrs. Bowens in her application, regarding ongoing chest pains and recent hospitalization.

9

the information OM was able to identify in Mrs. Bowens's medical records after Clark's claim was filed was not material to the Rider because Mrs. Bowens did not die of coronary artery disease or any other condition undisclosed on her application; but, rather, she died from causes completely unrelated to her health or medical history.

## CONCLUSIONS OF LAW

Under Section 154 of the Illinois Insurance Code, 215 ILCS 5/154 ("Section 154"),[4] an insurer may deny coverage, *inter alia*, because of a misrepresentation in an insurance application if the misrepresentation "materially affects either the acceptance of the risk or the hazard assumed by the company." 215 ILCS 5/154. Section 154 provides:

> No misrepresentation or false warranty made by the insured or in his
> behalf in the negotiation for a policy of insurance, or breach of a condition
> of such policy shall defeat or avoid the policy or prevent its attaching
> unless such misrepresentation, false warranty or condition shall have been
> stated in the policy or endorsement or rider attached thereto, or written
> application therefor. No such misrepresentation or false warranty shall
> defeat or avoid the policy unless it shall have been made with actual intent
> to deceive or materially affects either the acceptance of the risk or the
> hazard assumed by the company.

215 Ill. Comp. Stat. 5/154. A misrepresentation is "a statement of something as a fact which is untrue and affects the risk taken by the insurer." *Methodist Medical Center of Illinois v. American Medical Security, Inc.*, 38 F.3d 316, 319 (7th Cir. 1994) (*Methodist Medical*). An incomplete answer, or failure to disclose material information in a response to a question, in an insurance application can constitute a misrepresentation. *New England Mutual Life Ins. Co. v. Bank of Illinois in DuPage*, 994 F. Supp.2d 970, 976 (N.D. Ill. 1998) (*New England Mut. Life*). A misrepresentation, even if innocently

---

[4]The parties agree that Illinois law applies in this case.

10

made in good faith, may be grounds for voiding a policy if the misrepresentation materially affected the insurer's acceptance of risk. *Golden Rule Ins. Co. v. Schwartz*, 23 Ill.2d 456, 466 (2003); *Methodist Medical*, 38 F.3d at 320.

The materiality of a misrepresentation in an insurance policy application is a question of fact for the trier of fact. *Ratcliffe v. Int'l Surplus Lines Ins. Co.*, 550 N.E.2d 1052, 1058 (Ill. App. 1990). "Materiality is determined by asking whether a reasonably careful and intelligent person would have regarded the omitted facts as substantially increasing the chances of the events insured against, so as to cause a rejection of the application." *Royal Maccabees Life Ins. Co. v. Malachinski*, 161 F. Supp.2d 847, 853 (N.D. Ill. 2001) (*Malachinski*). "The materiality of a misrepresentation may be established by the underwriter's testimony or the testimony of the insurer's employees." *Methodist Medical*, 38 F.3d at 320.

Further, under Illinois law, "[a]n insurer is entitled to rely upon the truthfulness of an applicant's answer and has no duty to conduct an independent investigation into their accuracy." *Malachinski*, 161 F. Supp.2d at 854. An exception exists and an insurer may have a duty to investigate the correctness of an applicant's answers "when an insurer has been put on notice that an insurance application contains false answers." *Gibler v. Midwest Computer Register Corp.*, No. 86 C 3111, 1987 WL 17817, at *2 (N.D. Ill. Sept. 23, 1987). Further, the fact that the insured does not die from the misrepresented ailment does not affect the materiality of a misrepresentation. *New England Mut. Life*, 994 F. Supp. at 981.

11

## DECISION

The medical records of Mrs. Bowens and the testimony of the witnesses at trial conclusively demonstrate that Tamara Bowens did not disclose certain facts, stated above, regarding her health history. Mrs. Bowens failed to disclose in Parts 1 and 2 of her application that she had EKG tests, was diagnosed with coronary artery disease, reported chest pains to her doctor and was hospitalized in 2003 for chest pains. OM does not argue it is entitled to avoid the policy under Section 154 because Tamara Bowens made these omissions with an actual intent to deceive. Therefore, OM may avoid the policy under Section 154 of the Illinois Insurance Code only if it demonstrates that the information omitted from Mrs. Bowens's application regarding her health history materially affected OM's acceptance of risk or the hazard assumed in issuing Tamara Bowens's life insurance Rider. *See Apolskis v. Concord Life Ins. Co.*, 445 F.2d 31, 35 (7th Cir. 1971) (*Apolskis*) (Under Illinois law, "the presence of false statements in an application for insurance is not in itself a ground for avoiding an insurance policy issued on the basis of the application; the insurer must prove that the false statements either were made with intent to deceive or involved matters materially affecting the acceptance of the risk."). Stated differently, OM may avoid the policy if it shows that "reasonably careful and intelligent persons would have regarded the omitted facts as substantially increasing the chances of the events insured against so as to cause a rejection of the application or different conditions, such as higher premiums." *Jones v. Minnesota Mut. Life Ins. Co.*, No. 95 C 2878, 1995 WL 746187 (N.D. Ill. Dec. 14, 1995) (citing *Garde v. Country Life*, 498 N.E.2d 302, 308 (4th Dist. 1986)). Further, the fact

that Tamara Bowens did not die from heart disease does not affect the materiality of her misrepresentations in that regard.

Gunderson testified that had OM known of the facts Bowens omitted from her application, it would not have issued the policy as applied for. He testified that based on the information that was disclosed on Mrs. Bowens's application and the underwriting standards followed by OM, OM would not have ordered additional medical information on Bowens before issuing the Rider to her. Gunderson's testimony was generally persuasive and credible and established that this withheld information was material. A reasonably careful and intelligent person would conclude that the facts omitted from Mrs. Bowens's application substantially increased the chances of Mrs. Bowens's death, the event insured against. The omitted information indicates that Mrs. Bowens's medical condition was more serious than merely having high blood pressure controlled by medication, as disclosed. Therefore, the omissions are material.

Mendlesohn testified that in his opinion, OM was not careful in its handling of Bowens's application and did not review Tamara Bowens's medical records or contact her doctor before it issued her a life insurance policy but, instead, reviewed Bowens's medical records only after she died within the two-year contestability period and after Clark filed a claim for benefits.

OM counters that under Illinois law, an insurer has no obligation to make any independent investigation of an applicant's responses and is entitled to rely on the truthfulness of the applicant's answers.[5] While this is generally true, an insurer is not

---

[5]OM also presses its argument made at trial that Mendlesohn does not qualify as an expert in insurance "underwriting" and that his opinions should not be considered. However, the

13

entitled simply to bury its head in the sand. Under Illinois law, an insurer may have an obligation to conduct its own investigation if it is on notice that certain facts stated in an application may be false. *Apolski*, 445 F.2d at 36. In addition, an insurer cannot fail to seek clarification of plain ambiguities recorded by an agent on an application. *Yoon v. Investors Life Ins. Co. of North America*, Case No. 88 C 6768, 1990 WL 103651, at *4 (N.D. Ill. July 3, 1990).

Tamara Bowens reported on her application that she had high blood pressure controlled by medication, but this evidence cannot reasonably be said to have put OM on notice that Mrs. Bowens's application was false and that she omitted facts regarding her previously experienced recurrent chest pains, diagnosis of coronary artery disease and recent hospitalization. Mendlesohn testified that in his opinion the standard of care in the insurance industry generally would have required OM to follow up by contacting Mrs. Bowens's doctor.[6] However, Gunderson's uncontradicted testimony for OM was that the information provided by Bowens on the application did not create a situation where OM would have requested further medical information under its underwriting guidelines. Moreover, the law in Illinois does not impose a duty on an insurer to investigate an applicant's answers unless it is on notice that information on the application is false, as discussed above, or that answers recorded by the agent contain plain ambiguities; the

---

Court finds Mendlesohn qualified to testify as an expert in the field of insurance generally, including the standard of care in the industry in processing a life insurance policy; and his opinions will be considered to that extent.

[6]Mendlesohn testified that if "a doctor's name is voluntarily given on the application . . . it would be remiss if the underwriter didn't place a call" to the doctor regarding the applicant's medical history.

14

evidence does not support these exceptions. Rather, the evidence shows that Mrs. Bowens was directly asked whether she had had electrocardiogram tests and whether she was hospitalized, and she answered no to those questions. The questions stated on the application and asked of Mrs.Bowens should have elicited a correct and complete response from Mrs. Bowens. The untrue answers Mrs. Bowens gave on her application, as recorded by Zamoras and Caldwell, are not ambiguous. The undisclosed medical history as discussed above is material. Therefore, even though OM did not conduct an independent investigation of Mrs. Bowens's medical history before it issued a life insurance rider to her, and even though Bowen's ultimately died of causes completely unrelated to the omitted facts, OM may rescind Tamara Bowen's Rider to Ronald Bowen's policy of insurance under Illinois law. The evidence presented at trial shows that Tamara Bowen's omitted to report material information regarding her health history on her life insurance application, and OM was not on notice of the omissions such that it had an independent duty to investigate her health history.

## CONCLUSION

For the reasons stated above, judgment is hereby entered in this matter in favor of Defendant and against Plaintiff.

Date: _August 19, 2009_

JOHN W. DARRAH
United States District Court Judge

15